Tucker, P.
In this case it became important to establish the identity of a bla3k walnut, which the tenant contended was the beginning corner of Harrimaris patent, under which the demandant claimed. His patent call is to adjoin the upper end of Washington’s survey, at a large black walnut. Now the acknowledged upper boundary of Washington was about 565 poles, or considerably more than a mile and a half, below the black walnut contended for. And hence it became necessary to ascertain whether this black walnut was the tree referred to in the survey; for if so, it would control the call for Washington's line, upon the well established principle that natural or artificial boun *705 claries, which are the objects of the senses, must control the call for ideal boundaries, or for lines which are often matters of conjecture and always liable to be mistaken, and particularly where (as was the case here) the upper line of Washington was a protracted line. See Baxter v. Evett’s lessee, 7 Monroe 329, 333, 334. In order then to establish the fact that the black walnut was the reputed corner of Harriman, and that in making tiie survey it was by mistake supposed to be Washington’s upper corner, the tenant introduced the depositions of Lewis Jones, Benjamin Jones and William ArhucJcle. To these depositions the demandant objected. We concur in overruling his objections, for the following very satisfactory reasons, for which I am indebted to my brother Parker.
“ Three depositions were offered by the tenant, to the reading of which, and of either of them, the demandant objected, ‘for the reasons indorsed on the deposition of Lewis Jones, which were repealed, as to each of the others, ore temis.’
That indorsement objected to the deposition, so far as it gives the belief of the deponent, or others, as to the matters spoken of by him, or the understanding, reputation or tradition of the neighbourhood, it not being competent to prove boundaries between individuals by such evidence; also scalar as it purports to give the sayings or doings of others, not parties to this suit; that David Milhurn is living, and might be used as a witness; that it was not competent to prove what he said or did, even if such testimony was proper, without proving it by himself; that there were some questions of a leading character, the answers to which are objected to on that account.
This was the indorsement on the deposition of Lewis Jones. It was not an objection to the whole deposition, on the ground of interest, or any other; and it is palpable that there was much of that deposition which *706 ought to have been read in evidence, even if some of the demandant’s objections were sustainable. Then it was the duty of the party objecting, to point out the ex-eeptionable passages in the depositions, and move the court to expunge or disregard them. The demandant could not object to the reading of the whole deposition because there were parts of it exceptionable. It certainly was his duty to lay his finger upon the passages which in his opinion came within the scope of his objections, so that the mind of the court might be brought to bear upon them, instead of making a motion equivalent to the rejection of all the depositions; a motion which the court could not legally sustain. See Buster’s ex’or v. Wallace, 4 Hen. & Munf. 82.
The objections indorsed upon Jones’s deposition were perhaps all of them unfounded. Milburn was an interested witness, and could not have been examined by the tenant. He had married the widow, who was entitled to dower in all the land in controversy; and it is not shewn by the demandant that Milburn’s wife was dead. Being alive in the year 1795, the presumption was that at the time of the trial she was still living, unless the contrary was shewn. Bnt even if Milburn was living and competent to give evidence, it is not perceived how the evidence of Jones, connected with Mil-'burn, was incompetent. He speaks of facts, and not of mere declarations on the part of Milburn. Milburn put his father in possession of the land as Shadrack Harriman’s. He had married the widow, was guardian to the children, and in either character was entitled to rent the land. He also shewed the corners to his tenant, which cornel's, as the witness says, were then well understood in the country to be the true corners. It is then not a mere declaration o’f Milburn that the witness gives in evidence, but it is an act, to wit, the shewing of certain corner trees, which the general reputation of the neighbourhood fixed upon as the corners to Harri *707 man’s land. How could it be illegal evidence for Jones to speak of being shewn corners (no matter by whom) ‘which every person in the country, who knew any thing of the land surveys, called and believed to be Washington’s,’ — unless this last evidence of general reputation was inadmissible? The act of shewing the corner trees was one thing; the evidence establishing them as the true comers of the land, another. Even if Milburn’s shewing certain trees as the corners of the land was not evidence to establish them as comers, the fact that he pointed out trees, which by other evidence arc established as true corners, could not be rejected. The same remarks apply to Benjamin Jones’s deposition ; and as to ArbucMe’s, the objections indorsed do not, in several respects, touch it.”
It is objected, however, that evidence of reputation as to boundary is inadmissible, and that for this reason also the testimony introduced was improper.
Questions of boundary, after the lapse of many years, become of necessity questions of hearsay and reputation. For boundaries are artificial, arbitrary, and often perishable; and when a generation or two have passed away, they cannot be established by the testimony of -eyewitnesses. In such cases, therefore, it becomes necessary to look to reputation, or depend upon hearsay evidence of the former existence and actual locality of an artificial boundary. “ That boundaries may be proved by hearsay testimony,” says the supreme court, “ is a rule well settled, and the necessity or propriety of which is not now questioned. Land marks are frequently formed of perishable materials, which pass away with the generation in which they wore made. By the improvement of the country, and from other causes, they are often destroyed. It is therefore important in many cases, that hearsay or reputation should be received to establish ancient boundaries.” Boardman v. Reed, 6 Peters 328, 341. The reasons for ad *708 mitting evidence of reputation are so obvious, indeed, that they are forcibly stated even by those who fall short of our doctrines on this subject. See 1 Starkie on Evid. 54, 56. “ Some of these facts,” says this author (boundary is one of those of which he Awas speaking) “ from their antiquity, do not admit of direct proof by living witnesses, and consequently resort must be had to the best means of proof which the nature of the case affords. This consists in the traditionary declarations, in relation to matters of antiquity, of those who were likely to have possessed a knowledge on the subject, derived from their own observation or the information of others. Upon questions of fact to which antiquity is essential, as prescription, custom or boundary, the evidence of living witnesses is of little avail. For any knowledge concerning such rights, drawn from times more remote, recourse must be had to reputation and tradition.” It is singular that with such conclusive reasons in favour of this kind of proof in cases of boundary, the english courts, which recognize them, should have been inclined to confine the principle to public boundaries, such as the boundaries of manors, parishes, highways, and the like, and exclude its operation in a dispute about boundary between two private estates. 1 Starkie’s Evid. 62, 14 East 331, 3 Bac. Abr. Evidence. K. From these authorities it would seem that this has been and still continues vexata qucsstio. I shall therefore abandon them, and seek for guidance from the light of reason and from the american .cases.
Before I proceed with our enquiry, I beg leave to quote the remarks of justice Story upon this subject of evidence. “It is obvious,” says he, “ that as the rules of evidence are founded upon general interest and convenience, they must from time to time admit of modifications, to adapt them to the actual condition and business of men, or they would work manifest injustice; and lord Ellenborough has very justly observed that they *709 must expand according to the exigencies of society.” 8 Wheat. 332. “ We are not,” says lord Mansfield, “ to sit here, to take our rules of evidence from Keble or from Sideifin.” And if a rigorous adherence to antiquated rales of evidence would be inexpedient or unjust in the english courts, what differences, what expansions of those rules must not necessarily arise in a new country like ours, conquered from the savage, and granted out: to private adventurers while it still remained a wilderness. Because we have not manors, shall we therefore lose the benefit of the rule which considers boundary as matter of reputation, and permits hearsay evidence of its locality ? If a like state of things exists among us, if the principle will be found to apply in its utmost strictness, shall we reject the evidence because the case is not identical ? By no means. What then is the avowed principle on which the distinction rests in the Snglish courts ? “ In questions concerning public rights, reputation is admissible; for in such cases all mankind are considered as interested in preserving the evidence.” Bac. Abr. ubi supra. “ Upon questions of public right, all are interested, and must be presumed conversant with them ; and this is the distinction taken between public and private rights.” Per lord Ellenborough, 1 Maule & Selw. 686. “ Evidence of reputation upon general points is receivable, because all mankind being interested therein, it is natural to suppose that they may be conversant with the subjects, and that they would discourse together about them, having all the same means of information.” Per lord Kenyon. What language can be more appropriate to the cáse of laud adventurers in our western country? That country was covered with entries and surveys between fifty and sixty years ago, and it was often many years after a survey was made, before the tracts taken up were settled by their owners. Thousands have never yet seen their lands. The impossibility, in innumerable in *710 stances, of proving marked corners-by eyewitnesses is apparent. What is to supply that lost evidence ? If reputation is admissible to establish the boundaries of a manor, because all the tenants of the manor are interested therein, and are naturally conversant about the boundary, and may be presumed to discourse together about it, what shall we say in the case of our wild lands, which were covered with early adventurers, whose chief concern was to make themselves acquainted with the lines and corners of all around them ? Every one, who knows any thing of the history of that country, must know the deep interest and familiar knowledge which the early settlers possessed in relation to the corners and boundaries and localities, not only of their own particular tract, but of almost every tract within range of their settlement. Every one knows that such subjects were not only the familiar topics of conversation, but that they were the all absorbing topio«. I will venture to conjecture that for one discussion in private conversation as to the boundaries of an english manor, there have been a hundred animated and interested debates about the situation of a corner tree in our western counties. I take it, therefore, that every motive for the admission of hearsay testimony as ta boundary in case of a manor, applies with equal force to its admission in questions of boundary with us. I coincide in the opinion cited from Peters, that “ boundaries may be proved by hearsay testimony.” The testimony so admitted must however be that of a witness who is dead ; for if living .he ought himself to be brought forward.// I' rely also on the case of Ralston &c. v. Miller &c. 3 Rand. 44. although it was a question as to the boundaries of town lots, which perhaps, upon the strictest principles, may be considered as falling within even the english decisions.
The question still recurs, however, whether evidence may be introduced to prove the declarations of a wit *711 ness as to a particular fact, or merely as to general reputation. Thus, admitting the declarations of a witness that this black walnut was the reputed corner, to be proper, should we admit his declarations of the fact that that tree was pointed out to him, by a person who is dead or disqualified, as the true corner ?
The doctrine in England, as laid down in the books, is that though hearsay is good evidence in matters of reputation, yet a particular fact cannot be'proved by traditionary evidence. Outram v. Morewood, 5 T. R. 123. 1 Starkie on Evid. 61. Yet, notwithstanding this general rule, there are cases which form exceptions to it. Thus, the written memorandum of a father as to the time of the birth of his son may be given in evidence. 1 Starkie on Evid. 70.71. Yet this is but hearsay reduced to writing, and hearsay of a particular fact which is perfectly susceptible of proof aliunde. So the written entry of a surveyor, or his survey, which is made and returned under the sanction of an oath, would be evidence. Again, the entry of a clerk charging goods to a party is good evidence of the fact of delivery, if the clerk be dead. 1 Starkie on Evid. 72. Yet this is direct evidence, not on oath, to a particular fact which may be otherwise proved. Why then is it admitted ? “ Because,” says the author, “ he had peculiar means of knowledge, and made it in the course of a particular routine of business, at the same time, or nearly so, with the supposed act.” 1 Starkie 72. So with the surveyor. His survey is made in the course of an official routine of business, and he had peculiar means of knowing the facts which it sets forth. So in Nicholls v. Webb, 8 Wheat. 326. the notary’s books were admitted, after his decease, -as evidence of the particular facts of a demand of payment and notice of nonpayment; and pari ratione ihe survey must be admissible to prove a particular fact. Thus, then, it would seem that the written declarations *712 of a party having peculiar means of information are ad- . - TT . . . , missible. How is it as to parol declarations r
In Mima Queen v. Hepburn, 7 Cranch 290. the distinction was strongly taken between general evidence of reputation, and hearsay evidence as to a particular fact. This case was firmly relied on by judge Carr in Gregory v. Baugh, 2 Leigh 665. and cited with approbation also by judge Brooke. ,, The court was divided upon the question, judges Green and Cabell deeming the evidence of the particular fact admissible and proper. Judge Green observed that “ all evidence, whether direct or.by hearsay and reputation, consists in the proof of specific or particular facts. The general rule is indeed as laid down; but there are admitted exceptions, depending upon no arbitrary decisions of courts of justice, but upon sound principles of necessity and reason, according to the nature of the facts. If the fact be of such a nature as that, in the ordinary course of things, if it really existed, it might reasonably be expected that direct evidence of it would also exist, hearsay or reputation is inadmissible. But pedigree is an exception to the rule, and may be proved by hearsay and reputation.” He then proceeds to shew that pedigree consists exclusively of specific facts, among which he enumerates identity. All this applies most strongly io the proof of the identity of a corner tree, by proof of the declarations of a deceased witness. It is a fact which, in the ordinary course of things, after a generation has passed away, never can be proved by direct evidence, where the artificial boundary has been destroyed by time; and titles must be insecure, if this species of evidence is not admitted to establish the locality of a corner, where the marked tree has been destroyed. Accordingly, in the case of Gregory v. Baugh, I understand judge Brooke (who resisted the evidence in that case) to admit that in our country, in cases of boundary, such *713 evidence of particular facts must be admitted. The same thing is also decided by the supreme court (as I understand the case, already cited from Peters’s Reports) where the court is reported to have said that “ boundaries may be proved by hearsay testimony.” It is difficult indeed to understand why reputation that a particular tree is the boundary should be evidence, when the direct testimony of the man who knows the fact, and marked the tree, is not so. Both are equally without oath, and the latter has the advantage of the former, not only in being at the foundation, but also in the uncertainty which always hangs around matters of mere reputation, as to the accuracy of the source from whence it has been derived.
I hold, then, clearly, that evidence is admissible to prove the declarations of a deceased person as to the identity of a particular corner tree or bouudary, provided such person had peculiar means of knowing the fact; as, for instance, the surveyor or chain carrier who were engaged upon the original survey, or the owner of the‘tract, or of an adjoining tract calling for the same boundaries; and so of tenants, processioners, and others whose duty or interest would lead them to diligent enquiry and accurate information of the fact; always, however, excluding those declarations which are liable to the suspicion of bias from interest. If these principles be true, the declarations of Milburn against his own interest (if they are to be considered as declarations) were properly introduced ; for that is a sanction for his veracity which the law has always respected; and as he could not be compelled to testify, bis admissions ought to be received as if he were dead. See, on this subject, Starkie on Evid. part 4. p. 42. in note, citing 1 Esp. N. P. Cas. 458. See also 2 T. R. 54. 5 T. R. 121.
As to the evidence respecting the hunting party, it appears to me to be fairly incidental to the evidence of *714 reputation. For it is always proper to enquire into the _ , , . . . , source from which reputation arises; since peraaventure it may have sprung from an improper source. Thus, if Arbuclde had derived his information from Slaughter alone, his evidence would have been assailable, as the tenant claims under Slaughter.
Lastly, as to the entry. That the entry of a party may sometimes be admitted in evidence before the jury, to identify the calls of the patent, is acknowledged to have been decided by this court in Camden et al. v. Haskill, 3 Rand. 462. In this case the entry was rejected by the same judge who had, upon the trial, admitted it in the case just cited. I think there is much reason for distinction between the two cases. In Camden et al. v. Haskill, the patent called for “ a white oak and beech, corner to a survey of 40,000 acres made for David Lockwoodwithout any further description. The white oak and beech claimed by the plaintiff were proved to be “ 80 poles below the falls of Little Kanawha, on the north .side thereof.” The plaintiff introduced a copy of the entry on which his patent was founded, which called to begin at “ a white oak and beech on the north bank of the Little Kanawha, 80 poles below the falls thereof.” Now this entry did not control or contradict the patent. It only explained it, and identified the call, which in the patent itself was left indefinite. But in this case the patent calls “to adjoin the upper end of Washington's survey, at a large black walnut;” and thus refers to a certain, visible, actual boundary, which controls the call for the Washington survey, the location of which was mere matter of conjecture, and might easily have been mistaken, and in point of fact was mistaken. Taking the patent without the entry, the black walnut controls the other call. For what, then, was the entry to be introduced ? It was, to counteract this legitimate construction of the patent, and to lead the jury to be *715 licve that the plaintiff had a right to go to Washington's survey, wherever it might be. Whether it ought to have this effect or not, it was illegal testimony. If it would have the effect, it would contradict and control the patent; if not, it would be irrelevant, and therefore improper, as only calculated to embarrass and mislead the jury. I think, therefore, it was properly rejected, and that there is no error in the judgment of the circuit superiour court; which must therefore be affirmed.
The other judges concurred. Judgment affirmed.